NOTICE:  Summary decisions issued by the Appeals Court pursuant to M.A.C. Rule 23.0, as appearing in 97 Mass. App. Ct. 1017 (2020) (formerly known as rule 1:28, as amended by 73 Mass. App. Ct. 1001 [2009]), are primarily directed to the parties and, therefore, may not fully address the facts of the case or the panel's decisional rationale.  Moreover, such decisions are not circulated to the entire court and, therefore, represent only the views of the panel that decided the case. A summary decision pursuant to rule 23.0 or rule 1:28 issued after February 25, 2008, may be cited for its persuasive value but, because of the limitations noted above, not as binding precedent.  See Chace v. Curran, 71 Mass. App. Ct. 258, 260 n.4 (2008).

COMMONWEALTH OF MASSACHUSETTS

APPEALS COURT

23-P-503

RACHEL STEPHANO

<u>vs</u>.

MORRIS HEALTHCARE LLC,[1] & another.[2]

<u>MEMORANDUM AND ORDER PURSUANT TO RULE 23.0</u>

When the COVID-19 pandemic struck, plaintiff Rachel Stephano's mother was in hospice care at the Gardner Rehabilitation & Nursing Center (facility) in Gardner.  On April 28, 2020, Stephano was told that she should come to the facility right away because her mother appeared to be dying.  After Stephano and other close family members went to visit the mother, a dispute erupted about the group being at the facility and their compliance with COVID-19 protocols.  Ultimately, the facility called the police to escort the family from the

---

[1] Also known as Gardner Operations, LLC, doing business as Gardner Rehabilitation & Nursing Center.

[2] Gardner Healthcare Management LLC.

premises.  The facility then left Stephano a voicemail barring her from entering the facility to see her mother and obtained a "no trespass order" barring Stephano from visiting her mother. That order was served on Stephano on April 29, 2020, at approximately 7:07 P.M. and removed by the facility on April 30 at approximately 4:40 P.M., but Stephano thereafter was allowed to visit her mother only while supervised.  No other family member, including her brother was allowed to accompany her.

After her mother died, Stephano filed a four-count complaint in Superior Court against the entities that operated the facility (collectively, Gardner).  Gardner filed a motion to dismiss all counts on various grounds.  That motion was allowed as to two of the counts, which are not before us in the current appeal.[3]  Gardner filed motions for summary judgment with respect to the two remaining claims, one for defamation, and the other for intentional infliction of emotional distress (IIED).  Before us now is Gardner's interlocutory appeal of the denial of those motions.[4]  For the reasons explained, we affirm.

---

[3] The judge allowed Gardner's motion to dismiss with respect to Stephano's claims alleging breach of contract and violations of G. L. c. 93A.  Final judgment dismissing those claims has not entered.  Stephano did not pursue a cross-appeal of the partial allowance of Gardner's motion to dismiss in the current interlocutory appeal filed by Gardner.

[4] As is discussed infra, Gardner is in part relying on a statute that provided health care facilities immunity from suit during the COVID-19 emergency.  To that extent, Gardner could

2

Background.  There are two very different versions of what transpired during the incident and its aftermath.  In light of the procedural posture of the case, we are required to view the facts in the light most favorable to Stephano, the nonmoving party.  Adams v. Schneider Elec. USA, 492 Mass. 271, 280 (2023).  It bears noting, however, that the situation bore some inherent volatility, as one side was dealing with the impending death of a beloved family member, and the other was dealing with managing a very real public health crisis.

Under emergency guidelines applicable at the time, family members and others generally were barred from visiting nursing home patients.  There was, however, an exception that applied to end-of-life scenarios, so long as the visitors were screened.  When Stephano and other members of her family arrived at the facility to visit her mother, there was no one at the door to greet or screen them, and no signs posted.  While wearing masks, they made their way to the room where Stephano's mother and another patient resided.  Along the way, they encountered some facility staff members who were welcoming, sympathetic, and accommodating, e.g., by going to get chairs for them.  However,

---

pursue an interlocutory appeal as of right pursuant to the doctrine of present execution.  See Lynch v. Crawford, 483 Mass. 631, 634-635 (2019).  An order from a single justice of this court allowed Gardner to pursue an interlocutory appeal based on arguments unrelated to the immunity statute.

the atmosphere quickly changed after two nurse supervisors learned of the family's presence and viewed their entry as a security breach and a violation of COVID-19 safety protocols. There are markedly different accounts of what transpired. According to Stephano, she and her family were polite and cooperative throughout. While some other witnesses portray at least some members of Stephano's family as being loud, rude, and belligerent.

It is undisputed that Gardner called the police, and that after the police arrived, the family voluntarily left the facility. The following day, the director of the facility left a voicemail for Stephano saying that she could not come visit her mother again, which upset Stephano greatly. Additionally, at his direction, the facility obtained a temporary "no trespass" order barring Stephano from entering the premises, but later the next day rescinded that order. Stephano thereafter was allowed to visit her mother but was required to wear full personal protective gear (PPE) and to be escorted while at the facility, including having someone present during her visits with her mother. Stephano's mother died on May 6, 2020; certain details regarding her final days are reserved for discussion below.

There was extensive discussion at least among facility staff about the incident. Some facility personnel falsely

4

stated that Stephano and her family members had refused to comply with COVID-19 protocols, including the wearing of masks. At least one employee reported that the family had been drinking and partying at the dying mother's bedside. As part of its newsletter to the nursing home community, the facility reported Gardner's version of the incident, albeit without identifying Stephano or her family by name.

Discussion. 1. The relationship between Gardner's immunity argument and its merits arguments. In April of 2020, the Legislature enacted a statute rendering health care providers immune from suit with regard to some claims related to COVID-19. See St. 2020, c. 64, §§ 1-4 (COVID-19 immunity act). For present purposes, it suffices to say that the statute was intended to provide health care providers a safe harbor to the extent they in good faith were following COVID-19 protocols mandated by the government. The parties debate the scope of the protections the act offers, including whether it applies to claims brought by persons other than the patients of the health care provider whose conduct is at issue.

In the current appeal, Gardner places only limited reliance on its defense based on the COVID-19 immunity act. In fact, Gardner makes no argument that it is immune from Stephano's defamation claim (arguing instead that that claim fails as a matter of law for a different reason). Even with respect to

5

Stephano's IIED claim, Gardner is not arguing that it is immune from that claim in its entirety.[5]  Instead, Gardner argues that the IIED claim should be dismissed because its treatment of Stephano did not rise to the level of "extreme and outrageous" conduct necessary to support such a claim (regardless of whether any specific individual actions are covered by the COVID-19 immunity act).  We turn first to Gardner's arguments unrelated to the COVID-19 immunity act, and then return to that act only to the extent necessary.

2.  Defamation.  Gardner argues that the defamation claim must be dismissed because Stephano cannot prove financial loss caused by any defamatory statements.  See Ravnikar v. Bogojavlensky, 438 Mass. 627, 629-630 (2003).  "To withstand a motion for summary judgment for defamation, a plaintiff must show that:  [among other things] . . . . [t]he statement either caused the plaintiff economic loss (traditionally referred to as "special damages" or "special harm"), or is actionable without proof of economic loss."  Id.  Because it is undisputed that Stephano did not produce proof of economic loss, the question is

---

[5] Gardner argues that the COVID-19 immunity act precludes Stephano bringing her IIED claim based on some of the actions it took, such as its compelling her to leave the premises on the night of the incident.  It does not argue that all of its actions are shielded in this manner.

6

whether she could fit within one of the four recognized circumstances in which such proof is excused.  See id. at 630.

The judge denied Gardner summary judgment on the defamation claim notwithstanding the absence of economic loss based on the following two grounds:  "the plaintiff need not prove economic loss if defamatory statements charged her with a crime or prejudiced her profession."  We agree with Gardner in so far as it argues that none of the allegedly defamatory statements at issue stated that Stephano had committed a crime.  Although Gardner called the police to escort her from the premises, nothing suggests that Gardner had accused Stephano of already having committed any crime.[6]

We disagree with Gardner, however, with respect to whether damage to Stephano's "profession or business" was in play.  Stephano served as the executive assistant to the mayor of Gardner.  In that capacity, she was required to work closely with a variety of municipal officials (including, for example, those at the police department), and to deal with members of the public.  Especially during a major health crisis during which much of the economy was "locked down," we have little trouble

---

[6] We need not reach the question whether -- had Gardner reported that Stephano had committed a crime -- this would have been protected petitioning activity that could not support a claim for defamation.  See Polay v. McMahon, 468 Mass. 379, 386-387 (2014).

7

concluding that someone working closely with a mayor could have her professional reputation damaged by false allegations that she was refusing to comply with COVID-19 protocols.[7]  The same is true of statements that she was drinking and partying at her mother's deathbed.[8]  The judge did not err in declining to rule that Stephano's defamation claim failed as a matter of law.

3.  <u>IIED claim</u>.  Gardner argues that Stephano's IIED claim fails as a matter of law, because its conduct in any event was not so "extreme and outrageous" as to support such a claim. <u>Polay</u> v. <u>McMahon</u>, 468 Mass. 379, 385-386 (2014).  The Supreme Judicial Court has characterized that standard as "very high." <u>Id</u>. at 385.  Conduct is "extreme and outrageous" only if it "go[es] beyond all possible bounds of decency, and [is] regarded as atrocious, and utterly intolerable in a civilized community" (citation omitted).  <u>Id</u>.  See also <u>Lanier</u> v. <u>President & Fellows of Harvard College</u>, 490 Mass. 37, 48 (2022) ("To qualify as extreme and outrageous, then, a defendant's actions must flout the most basic community standards of decency and propriety").

_____

[7] To the extent that Gardner is suggesting that an executive assistant is a clerical position that cannot be considered a "profession," we reject that notion.

[8] The judge did not specifically address whether Stephano had produced any allegedly defamatory writings that could qualify as libel (one of the other exceptions recognized by <u>Ravnikar</u>, 438 Mass. at 630).  In light of how we rule, we need not consider that question.

8

"[H]eartless disregard" is not sufficient.  Conley v. Romeri, 60 Mass. App. Ct. 799, 805 (2004).

In assessing whether Stephano has demonstrated that Gardner acted with more than "heartless disregard," we are to accept her version of the events.  See Iannacchino v. Ford. Motor Co., 451 Mass. 623, 636 (2008).  Moreover, the summary judgment context requires that we put "as harsh a face on [Gardner's] actions . . . as the basic facts would reasonably allow." Zaleskas v. Brigham & Women's Hosp., 97 Mass. App. Ct. 55, 68 (2020), quoting Richey v. American Auto. Ass'n, Inc., 380 Mass. 835, 839 (1980).  We turn to applying these principles to the summary judgment record.

Stephano brought an IIED claim based on two different types of conduct:  "conduct that was directed at her," and "conduct that was directed to her mother."  The former includes such things as Gardner's having Stephano escorted out of the facility, temporarily barring her from returning, and allowing her only supervised visits thereafter.  Although the question is close, we conclude that a fact finder could find that Gardner acted in an extreme and outrageous manner, not merely one that was boorish and insensitive.  See Zaleskas, 97 Mass. App. at 68-69, and cases cited.  Despite complying with all COVID-19 rules presented to them, Stephano and her family were driven from her mother's deathbed by two supervising nurses who were known to be

9

bullies and to have filed false incident reports in the past. Then, without any adequate investigation, Gardner barred Stephano from returning for over a day despite the mother's extreme condition,[9] and when it restored Stephano's ability to visit her dying mother, it humiliatingly required her to be supervised for no apparent good reason.  And Gardner took its actions while knowing that they would cause Stephano great emotional pain.  Viewing the summary judgment record in the light most favorable to Stephano, we conclude that she has provided a sufficient showing with respect to the nature of the conduct that Gardner directed at her to survive summary judgment.  See Marr Equip. Corp. v. I.T.O. Corp. of New England, 14 Mass. App. Ct. 231, 235 (1982) (although summary judgment record may have supplied "at best a toehold to establish" liability, that "is enough to survive a motion for summary judgment").

The same is true with respect to the conduct on which Stephano relies that was directed at her mother.  This had to do with Gardner's taking the mother off of morphine in the wake of the April 28 incident.  In her complaint, Stephano alleged that she found her mother in great pain on May 2, 2020, and asked that the mother be administered morphine.  The nurse informed

---

[9] Gardner also barred a pastor from performing last rites on Stephano's mother.

10

her that because the mother's morphine prescription had been cancelled, morphine could not be administered until an order formally was reinstated.[10]  Stephano further alleged that the cancelling of the mother's morphine "was the result of some form of retaliation, arbitrary cruelness, or just recklessness."  She was "emotionally devastated" by Gardner's "leaving [the mother] to suffer during the final moments of her life," and by making the mother's passing "unnecessarily painful and just plain mean and cruel."

In its summary judgment motion, Gardner made no argument that summarily removing the mother's pain medications could not be considered extreme and outrageous conduct.[11]  Instead, Gardner focused on the timing of when Stephano learned that her mother had been taken off morphine.  It argued that because Stephano "was not present when her mother was allegedly taken off of morphine and she did not have 'substantially contemporaneous knowledge' of the alleged discontinuation . . . [t]he claim for [IIED] as to the alleged conduct towards the mother must be dismissed."  See Nancy P. v. D'Amato, 401 Mass. 516, 522 (1988)

---

[10] Stephano alleged that the nurse was reluctant to share the details with her despite the fact that she held her mother's health care proxy.

[11] We also note that no argument was, or could be, made that Gardner was immune from a such a claim pursuant to the COVID-19 immunity act.

(where IIED action is brought based on tort committed on another, plaintiff must show "(a) substantially contemporaneous knowledge of the outrageous conduct and (b) a severe emotional response"). The judge declined to allow Gardner's summary judgment motion with respect to any part of Stephano's IIED claim, without specifically addressing Gardner's timing argument regarding the discontinuation of the morphine. On appeal, Gardner's argument with respect to the discontinuation of the mother's pain medication is confined to a portion of a single sentence in which it maintains "that the plaintiff could not have legally suffered distress from the defendants' discontinuation of her [sic] end-of-life pain medication because she did not have substantially contemporaneous knowledge of the act." Putting aside whether this rises to the level of adequate appellate argument required by Mass. R. App. P. 16 (a) (9), as appearing in 481 Mass. 1628 (2019), it ignores the fact that when Stephano learned that her mother's pain medication had been discontinued, not only had only three or so days passed, but Gardner's alleged mistreatment of the mother was continuing.[12] In short, there is no convincing basis before us to reverse the

---

[12] To the extent that Gardner argues that Stephano has not demonstrated a sufficiently severe emotional reaction to support an IIED claim, we are unpersuaded. The intense effects that she alleges she suffered were supported not only by her own statements but also by the treatment notes of her therapist who reported what Stephano was suffering in detail.

denial of summary judgment as to the IIED claim to the extent that claim is based on the discontinuation of the mother's pain medication.

4. The application of the COVID-19 immunity act. The question remains whether the COVID-19 immunity act shields Gardner from facing an IIED claim based on some of its actions, even if its conduct was sufficiently extreme and outrageous to support such an action. Gardner makes no claim that it enjoys such immunity for some of its actions (such as its stopping the mother's pain medication), while arguing that it does so for those of its actions related to enforcement of COVID-19 protocols. Assuming arguendo that the COVID-19 immunity act applies to actions that Gardner took toward Stephano, such immunity applies only to the extent that Gardner acted in "good faith." See St. 2020, c. 64, § 2 (a) (iii) (providing that immunity applies only where "the health care facility or health care professional is arranging for or providing health care services in good faith"). For present purposes, it suffices to say that we agree with the judge that Stephano raised a factual dispute regarding whether Gardner was acting in good faith. Accordingly, Gardner has not shown at this stage that it is entitled to immunity from Stephano's IIED claim as a matter of law.

13

Conclusion. We affirm the order denying Gardner's motions for summary judgment.

So ordered.

By the Court (Milkey, Henry & Desmond, JJ.[13]),

Paul Little

Clerk

Entered: June 28, 2024.

---

[13] The panelists are listed in order of seniority.

14